Filed: March 9, 2011

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-1259
(5:07-cv-00028-gec)

EQUITY IN ATHLETICS, INCORPORATED,

Plaintiff - Appellant,

v.

DEPARTMENT OF EDUCATION; ARNE DUNCAN, Secretary of Education, in his official and individual capacity; SANDRA BATTLE, Acting Assistant Secretary for Civil Rights, in her official and individual capacity; UNITED STATES OF AMERICA; JAMES E. HARTMAN, Vice Rector, James Madison University, in his official and individual capacity; JEFFREY T. BOURNE, Athletics Director, James Madison University, in his official and individual capacity; MARK T. BOWLES, Visitor, James Madison University, in his official and individual capacity; JOSEPH F. DAMICO, Visitor, James Madison University, in his official and individual capacity; RONALD C. DEVINE, Visitor, James Madison University, in his official and individual capacity; LOIS J. FORBES, Visitor, James Madison University, in her official and individual capacity; CHARLES H. FOSTER, JR., Visitor, James Madison University, in his official and individual capacity; JAMES MADISON UNIVERSITY; STEPHEN R. LEEOLOU, Visitor, James Madison University, in his official and individual capacity; WHARTON B. RIVERS, JR., Visitor, James Madison University, in his official and individual capacity; LARRY M. ROGERS, Visitor, James Madison University, in his official and individual capacity; LINWOOD H. ROSE, President, James Madison University, in his official and individual capacity; JUDITH STRICKLER, Visitor, James Madison University, in her official and individual capacity; MEREDITH STROHM GUNTER, Rector, James Madison University, in her official and individual capacity; THE VISITORS OF JAMES MADISON UNIVERSITY; JOHN DOES, 1-200, in their official and/or individual capacity; JOHN DOE, Entities 1-200; VANESSA M. EVANS, Visitor, James Madison University, in her official and individual capacity; JOSEPH K. FUNKHOUSER, II, Visitor,

James Madison University, in his official and individual capacity; ELIZABETH V. LODAL, Visitor, James Madison University, in her official and individual capacity; FRED D. THOMPSON, JR., Visitor, James Madison University, in his official and individual capacity,

Defendants - Appellees.

_____

O R D E R
_____

The Court amends its opinion filed March 8, 2011, as follows:

On page 15, footnote 7 carry-over, first full paragraph, line 6 -- the citation to Emergency Coalition to Defend Educational Travel v. U.S. Dept. of the Treasury is corrected to read "545 F.3d 4, 11."

On page 25, footnote 12, line 5 – a pincite "10-15" is inserted in the citation to Hans v. Louisiana.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUITY IN ATHLETICS,
INCORPORATED,

        *Plaintiff-Appellant,*

        v.

DEPARTMENT OF EDUCATION; ARNE
DUNCAN, Secretary of Education,
in his official and individual
capacity; SANDRA BATTLE, Acting
Assistant Secretary for Civil
Rights, in her official and
individual capacity; UNITED STATES
OF AMERICA; JAMES E. HARTMAN,
Vice Rector, James Madison
University, in his official and
individual capacity; JEFFREY T.
BOURNE, Athletics Director, James
Madison University, in his official
and individual capacity; MARK T.
BOWLES, Visitor, James Madison
University, in his official and
individual capacity; JOSEPH F.
DAMICO, Visitor, James Madison
University, in his official and
individual capacity; RONALD C.
DEVINE, Visitor, James Madison
University, in his official and
individual capacity; LOIS J.
FORBES, Visitor, James Madison
University, in her official and
individual capacity;

No. 10-1259

CHARLES H. FOSTER, JR., Visitor, James Madison University, in his official and individual capacity; JAMES MADISON UNIVERSITY; STEPHEN R. LEEOLOU, Visitor, James Madison University, in his official and individual capacity; WHARTON B. RIVERS, JR., Visitor, James Madison University, in his official and individual capacity; LARRY M. ROGERS, Visitor, James Madison University, in his official and individual capacity; LINWOOD H. ROSE, President, James Madison University, in his official and individual capacity; JUDITH STRICKLER, Visitor, James Madison University, in her official and individual capacity; MEREDITH STROHM GUNTER, Rector, James Madison University, in her official and individual capacity; THE VISITORS OF JAMES MADISON UNIVERSITY; JOHN DOES, 1-200, in their official and/or individual capacity; JOHN DOE, Entities 1-200; VANESSA M. EVANS, Visitor, James Madison University, in her official and individual capacity;

JOSEPH K. FUNKHOUSER, II, Visitor, James Madison University, in his official and individual capacity; ELIZABETH V. LODAL, Visitor, James Madison University, in her official and individual capacity; FRED D. THOMPSON, JR., Visitor, James Madison University, in his official and individual capacity,

*Defendants-Appellees.*

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.
Glen E. Conrad, District Judge.
(5:07-cv-00028-gec)

Argued: December 7, 2010

Decided: March 8, 2011

Before GREGORY, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Gregory and Judge Wynn joined.

## COUNSEL

**ARGUED:** Lawrence John Joseph, Washington, D.C., for Appellant. Thomas Mark Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William Eugene Thro, CHRISTOPHER NEWPORT UNIVERSITY, Newport News, Virginia, for Appellees. **ON BRIEF:** Douglas

G. Schneebeck, MODRALL SPERLING, Albuquerque, New Mexico, for Appellant. Tony West, Assistant Attorney General, Timothy J. Heaphy, United States Attorney, Barbara C. Biddle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Kenneth T. Cuccinelli, II, Attorney General of Virginia, E. Duncan Getchell, Jr., State Solicitor General, Stephen R. McCullough, Senior Appellate Counsel, Charles E. James, Jr., Chief Deputy Attorney General, John F. Knight, University Counsel, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for James Madison University Appellees.

---

**OPINION**

DAVIS, Circuit Judge:

More than thirty years after Congress enacted a mandate for equal opportunity between the sexes in college athletics, this case reminds us that the realization of that congressional goal continues to pose myriad challenges to our nation's colleges and universities. Plaintiff-Appellant Equity in Athletics, Inc. (EIA), a membership organization comprised of student-athletes, coaches, parents, alumni, and fans, is a not-for-profit Virginia nonstock corporation. In this lawsuit seeking declaratory and injunctive relief, EIA challenges the Department of Education's (DOE) interpretative guidelines implementing the equal opportunity mandate of Title IX of the Education Amendments of 1972, Pub. L. 92-318, 86 Stat. 373, 20 U.S.C. §§ 1681-88 (Title IX). EIA alleges that the guidelines violate Title IX, the U.S. Constitution, and the Administrative Procedure Act (APA), 5 U.S.C. § § 551 *et seq.* EIA also seeks relief against James Madison University (JMU), challenging JMU's 2006 decision to eliminate ten of the university's varsity athletic teams (seven men's teams and three women's teams), on the grounds that the elimination of those teams violates Title IX, the U.S. Constitution, and Virginia law. The district court

granted defendants' motion to dismiss and dismissed the case; EIA has noted a timely appeal. For the reasons that follow, we affirm the judgment of the district court.

## I.

We begin with a brief review of the statutory and regulatory background relevant to this case.

In 1972, Congress enacted Title IX, which provides in part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Title IX did not specifically address its application to athletics, and in 1974, Congress enacted the Javits Amendment, which directed the Secretary of Health, Education, and Welfare ("HEW") to "prepare and publish . . . proposed regulations which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844 (1974) (Javits Amendment).

On June 20, 1974, HEW published its proposed regulations implementing Title IX, containing provisions that addressed the statute's application to athletic programs. 39 Fed. Reg. 22,227, 22,236 (June 20, 1974). HEW followed notice and comment rulemaking procedures, and President Ford approved the final regulations, as required by Title IX, 20 U.S.C. § 1682.[1] Effective July 21, 1975, the regulations pro-

---

[1]The relevant portion of the provision reads: "Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President." 20 U.S.C. § 1682.

vided in part that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 45 C.F.R. § 86.41(c). One of the ten factors used to determine equality of opportunity is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.*

In December 1978, HEW issued a Proposed Policy Interpretation to provide further guidance for the 1975 regulations. 43 Fed. Reg. 58,070 (Dec. 11, 1978). After receiving numerous comments in response to its proposed interpretation, HEW issued a Final Policy Interpretation in December 1979. 44 Fed. Reg. 71,413 (Dec. 11, 1979). The Policy Interpretation aimed to supply guidance to educational institutions to "effectively accommodat[e] the interests and abilities of male and female athletes" and provided that compliance would be assessed "in any one of the following ways":

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3) Where the members of one sex are underrepresented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* at 71,418. This provision has come to be known as the "Three-Part Test," and its first prong is at the heart of EIA's claims in this case against DOE and JMU.

In 1979, Congress split HEW into the Department of Health and Human Services and the Department of Education. *See* Department of Education Organization Act, 20 U.S.C. § § 3401-3510, Pub. L. 96-88 (1979). As part of that reorganization, HEW's functions with respect to educational programs were transferred to the Department of Education. 20 U.S.C. § 3441(a)(3) (transferring to DOE all functions of HEW's Office of Civil Rights, "which relate to functions transferred by this section"); *see also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 517 n.4 (1982) ("HEW's functions under Title IX were transferred . . . to the Department of Education."); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (noting that "we treat [DOE] as the administrative agency charged with administering Title IX").

In 1996, after soliciting public comments on its proposal, DOE issued a clarification to the 1979 Policy Interpretation. The clarification provided that institutions need only comply with one part of the Three-Part Test and enumerated factors that would guide DOE's analysis of compliance under each part. *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), *transmitted by* Letter from Norma V. Cantu, Assistant Secretary for Civil Rights, Department of Education ("1996 Clarification"), *reprinted in* J.A. 407-23 (guidelines provide "three individual avenues to choose from" in order to comply).

In 2003, DOE issued a Further Clarification, which reiterated that the 1979 Policy Interpretation did not mandate reductions to men's teams and noted that DOE disfavored the elimination of teams as a means of compliance. *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance* (July 11, 2003), *transmitted by* Letter

from Gerald Reynolds, Assistant Secretary for Civil Rights, Department of Education ("2003 Further Clarification"), *reprinted in* J.A. 424-26.

In 2005, DOE issued an Additional Clarification, emphasizing that institutions could demonstrate compliance under any prong of the Three-Part Test. *See Additional Clarification of Intercollegiate Athletics Policy Three-Part Test–Part Three* (March 17, 2005), *transmitted by* Letter from James F. Manning, Delegated Authority of Assistant Secretary for Civil Rights, Department of Education ("2005 Additional Clarification"), *reprinted in* J.A. 427-42. While attempting to delineate institutions' obligations under Title IX, these clarifications have emphasized that DOE intended to provide schools with flexibility in selecting methods of achieving compliance.

## II.

The parties here agree that the cardinal facts giving rise to this litigation are essentially undisputed. On September 29, 2006, JMU announced its plan to eliminate seven men's and three women's athletic teams in order to bring its intercollegiate athletic program into compliance with Title IX.[2] In a press release issued following its decision, JMU noted that, as of the 2006 fall semester, although women represented 61% of the undergraduate student body, they constituted only 50.7% of the varsity intercollegiate athletes. The press release went on to announce that the proposed cuts would yield a female athletic participation rate of 61%, a figure that would align more closely with female student enrollment.

In explaining its decision to eliminate the designated teams, JMU stated that "[a]lternatives were proposed, considered, and analyzed to deal with the need to come into compliance with Title IX," but ultimately, "the university was left with the

---

[2]JMU is a state-sponsored university in Virginia that has received and continues to receive federal funds.

need to comply with the proportionality prong [of the Three-Part Test]." J.A. 344. The university found that compliance under either of the two other prongs of the Three-Part Test was untenable. With respect to the second prong of the Test, JMU determined that it could not demonstrate a history or continuing pattern of program expansion to accommodate the needs of the under-represented sex, having added only one women's sport since 1990. JMU also found it could not comply with the third prong of accommodating unmet student interest, as "[a]ny solution that would require the addition of sports beyond the current 28 teams was deemed unacceptable." J.A. 344. As the university explained, "The primary reason for the decision was to bring JMU into compliance with the law." J.A. 344. The proposed team eliminations took effect on July 1, 2007.

Meanwhile, opponents of JMU's decision incorporated EIA on February 5, 2007 in order to challenge JMU's proposed cuts. On March 19, 2007, EIA filed this action against DOE, the Secretary of Education, the Assistant Secretary for Civil Rights, and the United States ("federal defendants"), challenging Title IX's interpretive guidelines. In particular, EIA asserted that DOE's 1979 Policy Interpretation, i.e., the Three-Part Test, and its subsequent Policy Clarifications violated Title IX, the U.S. Constitution, and the APA. At about the time it filed suit against the federal defendants, EIA requested that JMU defer its proposed elimination of the ten teams and, when JMU refused, EIA amended its complaint to join JMU and numerous JMU officials as defendants. EIA's complaint sought declaratory and injunctive relief that would invalidate the allegedly unlawful guidelines and forestall JMU's proposed team eliminations. In the alternative, EIA sought damages under Title IX to compel JMU to equalize scholarship payments to student-athletes affected by the alleged scholarship gap created by JMU's decision to eliminate teams.

On June 15, 2007, EIA filed a motion for a preliminary injunction to prevent JMU from going forward with its plan to cut the athletic teams slated for elimination. The district court denied the motion for preliminary injunction, *Equity in Athletics, Inc. v. United States Department of Education*, 504 F. Supp. 2d 88 (W.D. Va. 2007), and we affirmed the district court, 291 Fed. Appx. 517 (4th Cir. 2008) (unpublished), *cert. denied*, 129 S. Ct. 1613 (2009). Following the appeal of the denial of its motion for a preliminary injunction, EIA filed a second amended complaint, and the parties filed dispositive motions. On December 30, 2009, the district court granted the defendants' motions to dismiss and entered final judgment. *Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660 (W.D. Va. 2009) (the "District Court Opinion"). EIA brought this timely appeal. We review a district court's grant of a motion to dismiss *de novo*.[3] *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

## III.

We first address the issue of standing, which is indispensable to a federal court's exercise of jurisdiction. The federal defendants challenge EIA's standing to bring this suit, arguing that the underlying injury of which it complains could be redressed only by the university. JMU, on the other hand, contends that EIA's membership does not include female athletes on existing teams; it thus argues that EIA lacks standing to challenge the university's scholarship allocation. JMU does not contest EIA's standing with respect to its other claims.

---

[3]The district court had before it EIA's motion for summary judgment under Fed. R. Civ. P. 56 and the defendants' motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The district court granted the defendants' motions and denied EIA's motion, but it effectively treated all the motions as motions for summary judgment without objection from any of the parties. We discern no disputes of material fact, and no party raises any issues with respect to the content of the record before us.

Where, as here, the plaintiff is an organization bringing suit on behalf of its members, it must satisfy three requirements to secure organizational standing: (1) that its members would have standing to sue as individuals; (2) that the interests it seeks to protect are germane to the organization's purpose; and (3) that the suit does not require the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Individual members of the organization must be able to show that (1) they suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). This court assumes the merits of a dispute will be resolved in favor of the party invoking our jurisdiction in assessing standing and, at the pleading stage, "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd by District of Columbia v. Heller*, 554 U.S. 570 (2008) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."). Nonetheless, the Court has clarified that "pleadings must be something more than an ingenious academic exercise in the conceivable." *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973).

We find that EIA meets the requirements for organizational standing as to its claims against DOE and JMU. It appears uncontested that the interests EIA seeks to protect are germane to its purpose, given that EIA claims it acts to preserve broad-based athletic participation at JMU and other universities by seeking judicial invalidation of DOE's Three-Part Test. Further, its suit does not require the participation of its individual members, as EIA seeks declaratory and injunctive

relief against DOE's interpretations and JMU's actions predicated thereunder.[4] *See Hunt*, 432 U.S. at 343. Finally, EIA has made a sufficient showing that individual members meet the constitutional standing requirements of injury, causation, and redressability, as set forth in *Defenders of Wildlife*, 504 U.S. at 560-61.

With regard to injury, the record supports EIA's allegations that its members include current JMU students who were on the teams eliminated in 2007[5] as well as female athletes on continuing teams.[6] Moreover, EIA claims that its membership base is broader than students and includes coaches, alumni, and fans who assert that their injuries are manifested in denial not only of participation opportunities for athletes, but also of economic and associational opportunities. Because EIA can demonstrate that it has members that were directly affected by JMU's decision to eliminate teams to comply with prong one of the DOE's Three-Part Test, it has sufficiently stated an injury-in-fact. *See McCormick*, 370 F.3d at 285 (concluding the jurisdictional requirements were met because student ath-

---

[4]To the extent that EIA seeks to equalize female athletic scholarship allocations, EIA has provided affidavits by members assigning their claims to EIA. The Supreme Court has permitted organizational standing for assigned damages claims. *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008).

[5]At oral argument, counsel for JMU conceded that several EIA members who were athletes on teams eliminated in 2007 remain enrolled at JMU for the 2010-11 academic year.

[6]The district court addressed standing only with respect to EIA's claim regarding the allocation of female athletic scholarships. The court below concluded that EIA lacked standing to pursue this claim against JMU because it found "absolutely no indication . . . that EIA's members include female athletes on JMU's existing teams. . . ." District Court Opinion, 675 F. Supp. 2d at 684. The district court appears to be mistaken in its review of the record. The record includes affidavits from female athletes on existing teams that would have been affected by scholarship allocation. The affidavit of counsel for EIA states that these individuals are EIA members, though the students' affidavits are silent on this point. J.A. 454.

lete plaintiffs had not yet graduated and could benefit from the injunctive relief sought).

Similarly, we find that EIA has set forth allegations sufficient to support causation and redressability for standing purposes as to its claims against both DOE and JMU. EIA has shown that the injuries suffered by its members were fairly traceable to JMU's decision to eliminate teams, a decision JMU insists it made as part of an effort to comply with prong one of the DOE's Three-Part Test and its Title IX obligations. EIA contends that DOE's Three-Part Test caused injury to EIA members by inducing educational institutions, including JMU, to achieve proportionality by cutting and capping men's athletic teams. As JMU explained, having found compliance under the other two prongs untenable, "the university was left with the need to comply with the proportionality prong [of the Three-Part Test]." J.A. 344. EIA seeks redress for its members' injuries in the form of a declaration that the Three-Part Test is both substantively and procedurally invalid and an injunction to prevent JMU from maintaining the elimination of athletic teams in reliance on DOE's current interpretations of Title IX. Invalidating the Three-Part Test, EIA alleges, will redress its members' injuries by "restoring the 1975 regulatory standard, under which schools must provide opportunity (or ration scarcity) based on relative interest [rather than on substantial proportionality]." J.A. 257. Though such an outcome would not necessarily guarantee the restoration of the teams that JMU chose to eliminate, no explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing.

For example, in *National Parks Conservation Ass'n v. Manson*, the D.C. Circuit found that the plaintiff organization had shown redressability where, "although a federal district court ruling in favor of National Parks would not directly determine whether the Roundup Plant will get its permit, the effect of such a ruling would not be far removed." 414 F.3d 1, 6 (D.C. Cir. 2005). The court there found it sufficient that

the court's decision would "significantly affect" plaintiff's injuries. *Id.* at 7; *see also Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 526 (2007) (finding the redressability requirement met where the court's decision would reduce "to some extent" plaintiffs' risk of additional injury); *Utah v. Evans*, 536 U.S. 452, 464 (2002) (noting that "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" suffices to show standing); *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) ("Redressability examines whether the relief sought . . . will *likely* alleviate the particularized injury alleged by the plaintiff.") (emphasis added).

Here, JMU announced that it was relying on the proportionality prong of the Three-Part Test in making the cuts; accordingly, a declaration invalidating the Three-Part Test would likely significantly affect JMU's decision. More importantly, JMU would be bound by the decision of this court. This is not a case of injury resulting "from the independent action of some third party not before the court," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42 (1976). Rather, the regulated party here is also a party to the case, and, as such, will be bound by this court's determination of the validity of the agency's interpretations as well as the necessity for the school's actions to comply with such interpretations.[7] In light of JMU's reliance on prong one of the DOE's

---

[7]In this regard, this case differs from similar cases decided by the D.C. Circuit, in which a plaintiff organization sued the Department of Education, challenging the Title IX interpretations as substantively and procedurally flawed. *National Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) (hereinafter "NWCA"). The court there found that the plaintiffs lacked standing to sue DOE because their injuries were not redressable in a suit against DOE alone, but noted that they might be redressable in a suit against the universities. *Id.* at 936-37; *see also College Sports Council v. Dep't of Educ.*, 465 F.3d 20, 22 (D.C. Cir. 2006) (dismissing on standing grounds), *cert. denied*, 552 U.S. 821 (2007). Here, EIA has sued both DOE and the university. As such, the redressability concerns expressed by the D.C. Circuit in *NWCA* do not appear. At oral

Three-Part Test and the fact that JMU is a party to this action, we find that EIA has made a sufficient showing to demonstrate standing against both DOE and JMU.

## IV.

We next consider the merits of EIA's claims. EIA contends that the Three-Part Test is rendered substantively infirm by its alleged purposes and effects: "unlawfully establish[ing] a disparate-impact standard" and "unlawfully authoriz[ing] intentional discrimination." J.A. 286.[8] However, because neither of these contentions has merit, the district court properly granted defendants' motion to dismiss EIA's substantive challenge to the regulations.

## Title IX

Under the Three-Part Test, the first benchmark used to assess whether an educational institution is "effectively accommodat[ing] the interests and abilities of members of

---

argument, counsel for DOE conceded that the redressability issue that had existed in earlier cases against DOE alone was not present here because EIA had sued both DOE and JMU.

Moreover, there is no indication in this case that JMU would have taken the very same action to eliminate specific teams (or that it will maintain the specific eliminations) if the federal regulatory regime EIA attacks here were invalidated. This circumstance further distinguishes this case from *NWCA*. *See Emergency Coalition to Defend Educational Travel v. U.S. Dept. of the Treasury*, 545 F.3d 4, 11 (D.C.Cir. 2008) (distinguishing *NWCA* by noting that, "[T]here was reason to believe that universities might well independently implement the Title IX policy of equalizing male and female athletic resources by eliminating or restricting wrestling teams of their own accord, even if the court held that the government regulations at issue were illegal.").

[8]Though EIA raises a number of other substantive arguments, e.g., a spending clause claim, the district court considered them fully and found them to be without merit, as do we. *See* District Court Opinion, 675 F. Supp. 2d at 672-77.

both sexes," as required by 45 C.F.R. § 106.41(a), is "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." 44 Fed. Reg. 71, 413, 71,418. EIA argues that the use of this criterion violates Title IX by "requiring . . . schools where men are more interested than women in athletics . . . to discriminate against male student-athletes" and by effectively imposing an "affirmative action requirement" that mandates preferential treatment for women. J.A. 287.

EIA's argument appears to be based upon the notion that, because Title IX prohibits intentional discrimination as disparate treatment, any implementing regulation that is directed toward disparate impact violates the statute. EIA contends that the Three-Part Test constitutes a disparate impact standard that should not be permitted to "trump" Title IX's prohibition against intentional discrimination, citing the Supreme Court's recent decision in *Ricci v. DeStefano*, 129 S. Ct. 2658, 2675 (2009). However, EIA's argument both (1) fails to take into account the statutory language that explicitly permits consideration of sex-based disparities in Title IX enforcement actions and (2) mischaracterizes the Three-Part Test as a mandatory disparate impact standard.

EIA fails to acknowledge the clear statutory language of Title IX that allows for some consideration of proportionality between participation and enrollment. Title IX does not require proportionality between the percentage of persons of a particular sex who participate in an activity or program and the percentage of persons of that sex in the community as a whole. The provision at issue reads:

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or

> percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.*

20 U.S.C. § 1681(b) (emphasis added). However, as the plain language of the provision indicates, the statute does not forbid seeking such proportionality, and, moreover, as the highlighted language makes clear, the statute expressly allows for consideration of sex-based statistical imbalances in the course of enforcement proceedings.

In *Cohen v. Brown University*, the First Circuit rejected a similar challenge to Title IX's regulations. 101 F.3d 155 (1st Cir. 1996) (hereinafter "*Cohen II*"). In a suit by female student athletes against the university for failure to comply with Title IX, the university attempted to challenge the substantive validity of the Three-Part Test. The First Circuit found that "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination." *Id.* at 170-71 (finding that Title IX does not ban "gender-conscious remedies"). The Ninth Circuit has also held that Title IX "does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies." *Neal v. Bd. of Tr. of the Cal. State Univ.*, 198 F.3d 763, 771 (9th Cir. 1999). Like the defendants in those cases, EIA here fails to show how the Three-Part Test exceeds the permissive bounds of the statute.

In addition to its failure to take into account the express language of Title IX that permits consideration of sex-based

disparities, EIA also misconstrues the nature of the regulations themselves. EIA contends that DOE's Three-Part Test constitutes a mandatory disparate impact standard that would violate Title IX. However, this contention is without merit, as numerous courts have held.

In *Kelley v. Bd. of Tr., Univ. of Ill.*, the Seventh Circuit found that the "policy interpretation does not, as plaintiffs suggest, mandate statistical balancing. Rather the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance." 35 F.3d 265, 271 (7th Cir. 1994). The court in *Kelley* went on to note that, "[D]espite plaintiffs' assertions to the contrary, neither the regulation nor the policy interpretation run afoul of the dictates of Title IX." *Id.* at 272. The First Circuit in *Cohen II* echoed this rejection:

> [The University's] talismanic incantation of "affirmative action" has no legal application to this case and is not helpful to [its] cause. . . . No aspect of the Title IX regime at issue in this case-inclusive of the statute, the relevant regulation, and the pertinent agency documents-mandates gender-based preferences or quotas, or specific timetables for implementing numerical goals.

101 F.3d 155, 170 (1st Cir. 1996) (citations omitted).

Moreover, courts have held that the Three-Part Test provides universities with flexibility in achieving statutory compliance. The Ninth Circuit in *Neal* found:

> Every court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented

> gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender.

198 F.3d at 770. As the First Circuit emphasized in its first opinion in *Cohen v. Brown University*, "Title IX does not require that a school pour ever-increasing sums into its athletic establishment." 991 F.2d 888, 898 n. 15 (1st Cir. 1993) (hereinafter "*Cohen I*"). The Tenth Circuit further clarified that "[f]inancially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population." *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 830 (10th Cir. 1993).

DOE itself has consistently emphasized that its guidance is meant to provide this kind of flexibility to educational institutions, explaining that the Three-Part Test "furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics." 1996 Clarification, *reprinted at* J.A. 413. Further, "[i]f a school does not satisfy the 'substantial proportionality' prong, it would still satisfy the three-prong test if it" can meet one of the remaining prongs. 2003 Clarification, *reprinted at* J.A. 425. EIA's claim that sex-based balancing for the purposes of achieving participatory proportionality violates Title IX has been consistently dismissed, as has its contention that the Three-Part Test creates a mandatory disparate impact requirement. Because EIA fails to provide support to the contrary, the district court's dismissal of this claim was proper.

## Equal Protection

EIA also hypothesizes that the Three-Part Test violates the equal protection clause of the Fourteenth Amendment by "requiring compliance with an enrollment-based quota" that

"serves no government purpose." Appellant's Br. at 40. Relying on the decisions of the First, Seventh, and Ninth Circuits, the district court rejected EIA's argument that the Three-Part Test is unconstitutional, stating that "every appellate court that has considered the constitutionality of the proportionality prong of the Three-Part Test has held that it does not offend constitutional principles of equal protection." District Court Opinion, 675 F. Supp. 2d at 671. The district court's analysis is sound.

In *Kelley*, the Seventh Circuit explained,

> While the effect of Title IX and the relevant regulation and policy interpretation is that institutions will sometimes consider gender when decreasing their athletic offerings, this limited consideration of sex does not violate the Constitution. . . . There is no doubt but that removing the legacy of sexual discrimination-including discrimination in the provision of extra-curricular offerings such as athletics-from our nation's educational institutions is an important governmental objective.

35 F.3d at 271-273; *see also Cohen I*, 991 F.2d at 900-901 (rejecting Brown University's equal protection challenge to the Three-Part Test). The Ninth Circuit in *Neal* adopted the reasoning of the First and Seventh Circuits and held that "the constitutional analysis contained therein persuasively disposes of any serious constitutional concerns" that might be raised with respect to the Three-Part Test. 198 F.3d at 772; *see also Boulahanis v. Bd. of Regents*, 198 F.3d 633, 639 (7th Cir. 1999) (reiterating *Kelley's* holding). EIA's equal protection argument has been widely rejected, and this court finds the reasoning of our sister circuits persuasive.

To counter this overwhelming rejection of its contentions by other courts, EIA cites to *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), for the propo-

sition that any attempt to achieve "balance" or proportionality in the education context is inappropriate. However, as the district court explained, *Parents Involved* and other race-based cases furnish no support for EIA's position. *Parents Involved* centered on race-based school assignments and the strict scrutiny to which racial classifications are subject. 551 U.S. at 720. The Supreme Court's analysis in *Parents Involved* has little bearing on a case involving sex-based classifications, which are subject to the lesser standard of intermediate scrutiny.[9] Here, EIA concedes the higher degree of scrutiny applied by the Court in *Parents Involved* when it notes that the court rejected balancing as a "compelling interest." Appellant Br. 62. It is far from clear that achieving sex equality in college athletics is not an *important* government interest, and EIA fails to show otherwise.[10] Moreover, the nature of collegiate athletics differs from the school assignments at issue in *Parents Involved* in part because teams are segregated by sex and participation opportunities are decided in advance. In *Neal*, the court noted that these differences meant that "[t]he paradigm that has motivated the Supreme Court's more recent [racial] reverse-discrimination jurisprudence simply does not fit the case at bar." 198 F.3d at 773 n.8. EIA fails to provide any support to the contrary. Accordingly, EIA's equal protection claim, like its claim based on Title IX itself, was properly dismissed.

---

[9]*See Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006) ("A statute that explicitly classifies people based on sex is subject to intermediate scrutiny, which means 'it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'") (quoting *Nguyen v. INS*, 533 U.S. 53, 60 (2001)).

[10]Seemingly in an effort to move its equal protection claim into the realm of strict scrutiny, EIA attempts to argue that its members' "associational rights" under the First Amendment have been harmed by the Three-Part Test. However, EIA can cite to no authority for applying First Amendment case law in this context. Thus, the district court properly rejected this argument. District Court Opinion, 675 F. Supp. 2d at 672-73.

V.

EIA also argues that the district court erred in rejecting its claims that publication of the Three-Part Test was procedurally flawed and its efficacy therefore fatally undermined. Among the procedural flaws that EIA complains of are the fact that the Three-Part Test did not undergo APA notice and comment review and lacked presidential approval as mandated by Title IX.[11] We conclude that the district court properly dismissed EIA's procedural claims.

APA Notice and Comment

EIA claims that DOE's Three-Part Test is procedurally invalid because neither the 1979 Policy Interpretation nor the DOE's subsequent clarifications underwent the notice and comment procedures prescribed by the APA, 5 U.S.C. § 553. The district court found that neither the 1979 Policy Interpretation nor the later clarifications were subject to the APA's notice and comment requirements because they were "interpretative guidelines" and "did not create new rights, impose new obligations, or change the existing law." District Court Opinion, 675 F. Supp. 2d at 677 (citing *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir. 1995)).

---

[11]Though it is somewhat difficult to glean its argument, EIA also appears to challenge the procedural validity of the Three-Part Test due to HEW's failure to comply with the "laying-before" requirement of the General Education Provisions Act (GEPA), 20 U.S.C. § 1232(d)(1). That provision required final HEW regulations to be presented to Congress, whose disapproval could prevent the regulation from taking effect. 20 U.S.C. § 1232(d)(1). In any event, EIA concedes, albeit inartfully, that HEW carefully considered the requirements imposed by GEPA and found that they did not apply to its 1979 Policy Interpretation. Reply Br. 21. *See also* Letter from Patricia Roberts Harris, Secretary of Health, Education, and Welfare, to the Honorable William D. Ford, Chairman, Subcommittee on Postsecondary Education, Committee on Education, House of Representatives (Feb. 11, 1980), *reprinted at* J.A. 388-89 (explaining HEW's reasoning for not presenting the interpretation to Congress). We find EIA's argument with respect to GEPA to be without merit.

At the time the 1979 Policy Interpretation went into effect, the agency noted that it "represent[ed] [HEW's] *interpretation* of the intercollegiate athletic provisions of Title IX . . . and its implementing regulation." 44 Fed. Reg. 71,413 (emphasis added). Both the 1979 Policy Interpretation and the subsequent policy clarifications were intended to provide "additional *guidance* on the requirements for compliance with Title IX." 44 Fed. Reg. 71,413 (emphasis added).

EIA contends that the 1979 Policy Interpretation and the subsequent clarifications *amended* the regulations, but it utterly fails to provide support for this contention. As the district court appropriately noted, "[a]n interpretive guideline does not 'become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted.'" District Court Opinion, 675 F. Supp. 2d at 677 (quoting *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). In *NWCA*, the D.C. Circuit regarded DOE's Three-Part Test as "interpretive guidelines that the Department was not obligated to issue in the first place." 366 F.3d at 940. As a result, the court there found that the policies were not subject to notice and comment requirements. EIA's claims regarding procedural flaws due to lack of notice and comment similarly fail here.

## Presidential Approval

EIA also contends that the Three-Part Test is procedurally invalid because it was not approved by the President. As described in Part I *supra*, 20 U.S.C. § 1682 provides in part that any "rule, regulation, or order" issued by a federal agency to effectuate Title IX must be approved by the President in order to become effective. Consistent with this requirement, President Ford signed the Title IX regulations promulgated by HEW in 1975. EIA contends that the 1979 Policy Interpretation, including the Three-Part Test, is invalid because it lacked similar presidential approval. The district court correctly rejected this contention as meritless.

As with the APA's notice and comment requirements, courts have held that the requirement of presidential approval does not apply to the issuance of interpretive guidelines. *See, e.g.*, *Cohen v. Brown Univ.*, 879 F. Supp. 185, 199 (D. R.I. 1995), *rev'd in part on other grounds*, 101 F.3d 155 (1st Cir. 1996) (holding that the 1979 Policy Interpretation "need not be approved by the President in order to become effective," as it "is not a rule, regulation, or order"). EIA's efforts, moreover, to corral the full range of agency action into the categories that require presidential approval fail to grasp long-standing conceptions of administrative law and are without merit. *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (noting that "agencies charged with applying a statute necessarily make all sorts of interpretive choices"). We find the reasoning of these courts persuasive, and find that EIA's argument with regard to procedural invalidity of the Three-Part Test due to lack of presidential approval also fails. The district court properly rejected EIA's procedural claims, and this court finds no reason to disturb that judgment.

## VI.

Finally, EIA asserts both state and federal claims against JMU. With respect to state law, EIA alleges that JMU violated the Virginia Freedom of Information Act by "working in secret" to eliminate athletic teams and violated other state laws by making the decision to eliminate teams "for the express purpose of attaining enrollment proportionality." J.A. 295. EIA claims JMU violated federal law in the following ways: (1) that JMU violated the Equal Protection Clause by eliminating ten athletic teams to comply with the Three-Part Test; (2) that JMU violated its members' substantive and procedural due process protections by eliminating the ten teams in order to comply with the Three-Part Test; and, finally, (3) that JMU violated Title IX by eliminating ten athletic teams, which resulted in both a participation and scholarship gap, in violation of the Three-Part Test. The district court properly

dismissed the claims against the JMU defendants, and we affirm for the following reasons.

## State Law Claims

The district court dismissed EIA's state law claims as barred by the Eleventh Amendment. The Eleventh Amendment provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.[12] Courts have held this immunity to extend to "state agents and state instrumentalities." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). Though there are several well-established exceptions to this jurisdictional bar,[13] as the district court noted, "None of the established exceptions . . . permit private citizens to bring suit against state officials for injunctive or declaratory relief designed to remedy violations of *state* law." District Court Opinion, 675 F. Supp. 2d at 679. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding an exception to Eleventh Amendment immunity "inapplicable in a suit against state officials on the basis of state law"); *see also Antrican v. Odom*, 290 F.3d 178, 187 (4th Cir.

---

[12]The Eleventh Amendment, though without express language to this effect, has been interpreted to bar suits brought by a citizen against his own state. *See Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001) (citing *Litman v. George Mason Univ.*, 186 F.3d 544, 549 (4th Cir. 1999); *Hans v. Louisiana*, 134 U.S. 1, 10-15 (1890)).

[13]*See, e.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (holding that Congress may abrogate a state's immunity pursuant to its enforcement power under § 5 of the Fourteenth Amendment); *Ex parte Young*, 209 U.S. 123 (1908) (holding that the Eleventh Amendment does not prevent private individuals from bringing suit against state officials for prospective injunctive or declaratory relief for ongoing violations of federal law); *United States v. Texas*, 143 U.S. 621, 644-45 (1892) (holding that the United States may bring suit against a state to enforce compliance with federal law).

2002) (finding that the *Ex parte Young* exception "does not apply to actions against State officials seeking to compel their compliance with State law").

To overcome this bar, EIA contends that "§ 1988(a) 'federalizes' state-law doctrines into EIA's federal cause of action under 28 U.S.C. § 1343 and 42 U.S.C. § 1983." Appellant Br. 25. EIA argues that § 1988(a) incorporates Virginia's Human Rights Act into EIA's § 1983 claim against state officers. Without specifying which elements are missing from the federal law that state law could provide, EIA maintains that "[s]tate law supplies elements to EIA's § 1983 claims." Appellant Br. 25. EIA fails to offer support for this proposition,[14] but we need not decide the issue here, as it is not squarely before us. Therefore, we affirm the district court's dismissal of EIA's state law claims.

## Equal Protection

EIA next alleges that JMU's decision to eliminate certain men's athletic teams violated the equal protection rights of male athletes with respect to participation. The district court rejected this argument, noting that JMU's "eliminations were made in an attempt to comply with the requirements of Title IX," a reason that two other circuit courts had found sufficient

---

[14]The cases cited by EIA are of no avail. In *Bragg v. West Virginia Coal Ass'n*, this court *rejected* plaintiffs' argument attempting to enforce federal law in a suit against state officers. 248 F.3d 275, 295 (4th Cir. 2001) ("By giving States exclusive regulatory control through enforcement of their own approved laws, Congress intended that the federal law establishing minimum national standards would "drop out" as operative law and that the State laws would become the sole operative law."). In *Antrican v. Odom*, this court found that the Eleventh Amendment did not bar plaintiffs' claim in a suit against state officers enforcing a state Medicaid program, but did so on the grounds that federal standards continued to be "directly applicable." 290 F.3d 178, 187-88 (4th Cir. 2002). Neither of these cases is relevant to EIA's arguments attempting to enforce state law against state officers or to demonstrate how state law might provide elements to its federal claims.

to reject similar claims. District Court Opinion, 675 F. Supp. 2d at 680 (citing *Kelley*, 35 F.3d at 272; *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 614 (6th Cir. 2002)).

Arguing that the district court's reliance on the *Kelley* and *Miami Univ. Wrestling Club* decisions is misplaced, EIA appears to contend that, even if the Title IX regulations are valid on their face, JMU's implementation of them violated equal protection. However, EIA fails to provide any support for its as-applied challenge other than to claim that JMU has established an impermissible quota, a claim that has been roundly rejected by other courts, *see* Part IV.A-B *supra*.

In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 560-61 (2007). Here, EIA has failed to make sufficient allegations with respect to either element.

Other courts have relied on the intent element to dismiss similar claims in the past. In *Miami Univ. Wrestling Club*, the Eighth Circuit noted, "Only if Title IX, its regulations or the Policy Interpretation are unconstitutional . . . could we hold that Miami's compliance with the law and the regulations is unconstitutional." 302 F.3d at 614. Here, JMU made its decision to cut the teams in order to comply with the Three-Part Test. As such, EIA fails to plead facts plausibly identifying any discriminatory intent on the part of the university decision makers.

Moreover, to avoid dismissal of its claim, EIA must plead sufficient facts to show, plausibly, that JMU treated male athletes differently from female athletes. While JMU relied on sex in making its decision about which teams to cut, its efforts were an attempt to bring athletic participation in line with the

student body population. As such, although more male athletes might have been affected by the cuts, the result was to ensure that the student body as a whole was "substantially equally" represented in the availability of opportunities for athletic participation.

EIA argues that the student body is not the appropriate pool against which to compare athletic participation; rather, it contends such comparisons should be made with respect to interest. However, in affirming the district court's denial of EIA's motion for preliminary injunction, we found that "[c]ourts have consistently rejected EIA's underlying claim that equal opportunity under § 86.41 should be tied to expressed interest rather than actual participation." *Equity in Athletics*, 291 Fed. Appx. at 523. We unhesitatingly make clear our endorsement of this principle. As the First Circuit explained in *Cohen II*, "[i]nterest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience." 101 F.3d at 179. *See also Neal*, 198 F.3d at 767 (finding that an approach that ties interest to opportunity is "fundamentally inconsistent with the purpose of Title IX"). EIA's attempts to shift the focus of this long-standing inquiry into proportionality are unpersuasive.

Because EIA fails to provide any support for its equal protection challenge to JMU's decision to eliminate ten athletic teams, we affirm the district court's dismissal of that claim.

### Due Process

EIA also claims that JMU violated the substantive and procedural due process rights of the student-athletes on the teams chosen for elimination. However, because EIA fails to identify a specific liberty or property interest that student-athletes were deprived of as a result of JMU's actions, we affirm the district court's dismissal of this claim.

In order to make out either a substantive or procedural due process claim, a plaintiff must allege sufficient facts to sup-

port a finding that the student-athletes "were deprived of life, liberty, or property, by governmental action." *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002). In order to have a property interest in a benefit, a person must have more than a mere "unilateral expectation of it" or "abstract need or desire for it." *See Roth*, 408 U.S. at 577.

The district court found that EIA failed to offer any support for its claim that a property interest in "continued participation in intercollegiate athletics exists" under state law. District Court Opinion, 675 F. Supp. 2d at 680. As the district court noted, other courts have addressed this issue and have consistently held that "the interest of the student athletes in participating in intercollegiate sports was not constitutionally protected." *Colo. Seminary v. Nat'l Collegiate Athletic Ass'n*, 570 F.2d 320, 321 (10th Cir. 1978); *see also Neosho Cmty. Coll.*, 741 F. Supp. 854, 861 (D. Kan. 1990). On appeal, EIA challenges the district court's conclusion, but the cases it cites are inapposite, relying, by and large, on contract theories. Though individual athletes could have contract claims with respect to lost scholarships,[15] EIA fails to show how these cases have established a property interest in intercollegiate athletic *participation*.

EIA fails both to address this long-standing body of precedent in its briefs and to provide support for its preferred outcome. Accordingly, we conclude the district court properly dismissed EIA's due process claims against JMU.

---

[15]This issue is not before the court, as EIA makes no due process claims with respect to lost scholarships; JMU did not eliminate scholarships for athletes on the teams that were cut.

Title IX

EIA argues in the alternative that JMU's actions violated the Three-Part Test and Title IX in that JMU "overdid its elimination of male athletes." Appellant's Br. 70. EIA alleges that in the 2007-08 academic year, as a result of JMU's cuts, "men became the under-represented gender in JMU athletics, by 2%, which represents 17 male athletic slots." Appellant's Br. 17. Because of this lack of exact proportionality, EIA claims, JMU ultimately "violat[ed] the Three-Part Test to the extent that it has any lawful effect." J.A. 296. This contention misses the mark.

According to figures submitted by EIA, men made up 39.1% of JMU's undergraduate population, but only 37.1% of the university's athletes in 2007-08. J.A. 455. However, EIA's figures are inconsistent with those collected by DOE. Contrary to EIA's assertions, the record demonstrates that, for the 2007-08 academic year, 37.98% of athletic spots at JMU were allocated to men (320 female athletic slots and 196 male athletic slots), whereas men constituted 39.13% of the total student body (10,608 women and 6,820 men). J.A. 311. Based on these figures, men were only "underrepresented" by 1.15%, and not two percent as claimed by EIA.

Notwithstanding EIA's mistaken calculations, the district court correctly noted that the gap created by JMU's attempts to comply with the proportionality prong of the Three-Part Test, regardless of whether it was one or two percent, was insufficient by itself to establish a violation under Title IX, as the DOE has expressly noted that determinations of what constitutes "substantially proportionate" under the first prong of the Three-Part Test should be made on a case-by-case basis. 1996 Clarification, *reprinted at* J.A. 415 ("Because this determination [of substantial proportionality] depends on the institution's specific circumstances and the size of its athletic program, [DOE] makes this determination on a case-by-case basis, rather than through use of a statistical test."). Moreover,

as the district court noted, other courts that have addressed the issue have found educational institutions to be in compliance with Title IX where the sex disparity was similar to that alleged by EIA. *See, e.g.*, *Boulahanis*, 198 F.3d at 639 (finding substantial proportionality where the number of male athletes was within three percentage points of enrollment following the elimination of men's soccer and wrestling); *Miami Univ. Wrestling Club*, 302 F.3d at 614 (noting successful Title IX compliance where the number of female athletes was within two percentage points of the number of female students).

EIA provides no support for its contention that a disparity as low as 2% (and, according to the record, not much above 1%) is substantially disproportionate as a matter of law. As such, we affirm the district court's dismissal of this claim.

EIA also alleges that JMU created "a further and larger admitted gap in scholarship proportionality" as a result of its cuts, in violation of DOE policies. Appellant's Br. at 73. Claiming that the difference in athletic participation created an 11.94% disparity between male and female athletic scholarships, EIA contends that "JMU was $1.3 million away from having its female scholarships fall within 1.0 percent of women's athletic participation." *Id.* EIA calls for retroactive payments under Title IX, arguing that JMU's cuts created this disparity. Though the district court failed to reach the merits of this claim, it is plain that EIA's argument fails for several reasons.

First, EIA cites to no authority for the proposition that a scholarship allocation disparity of no more than one percent is *required* by DOE policy. As with the participation gap, DOE has not specified a magic number at which substantial proportionality is achieved. *See* 1996 Clarification, *reprinted at* J.A. 415 (noting, in the course of discussing participation opportunities, that "in some circumstances it may be unreasonable to expect an institution to achieve exact proportional-

ity"). Second, EIA fails to address whether and how this gap has changed in the years since the initial cuts were made. There is no dispute that some of the scholarship funds in 2007-08 went to "pay scholarships to former athletes on discontinued teams." Reply Br. 38. However, that need would have been eliminated as those students graduated, no doubt reducing the scholarship gap created after the cuts were initially made.

Finally, while the 11.94% disparity in scholarship allocation cited by EIA appears more substantial than the participation gap, the figure is based on the number of athletic slots at JMU, and not the number of individual athletes. For the 2007-08 academic year, for example, whereas each male athlete participated on only one team, a number of women athletes participated on more than one team such that there were actually only 240 individual female athletes compared to 196 male athletes. J.A. 311-313. Based on the 240 actual female athletes—as opposed to female athletic slots—at JMU, women only received 4.10% fewer scholarship dollars than men.[16] When calculated using individual athletes, the scholarship gap is substantially smaller than that claimed by EIA.

## VII.

The district court's dismissal of EIA's constitutional, statutory, and procedural claims against DOE and JMU was entirely proper. Accordingly, the judgment of the district court is

*AFFIRMED.*

---

[16]According to statistics collected by DOE for 2007-08, female athletic teams received 50.94% of athletics-related student aid at JMU. J.A. 313. Based on the actual number of female athletes (240) and not female athletic slots (320), female athletes represented 55.04% of the total student athletes at JMU in 2007-08. J.A. 311. 55.04% − 50.94% = 4.10%.